IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ADRIAN ARMSTRONG
Plaintiff

vs

THE UNITED STATES OF
AMERICA, by and through ERIC
HOLDER, Attorney General, in his
official capacity
Defendant

CIVIL 12-1605CCC

## OPINION AND ORDER

This is a malicious prosecution claim against the United States brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), by Adrian Armstrong, a.k.a. "Ruddy" (Armstrong), a defendant in a criminal case filed before this Court, Criminal No. 04-250(JAG), seeking damages in the amount of $45,000,000.00.   The Amended Complaint filed on February 12, 2012 (d.e. 6) repeatedly avers that there was no probable cause to indict Armstrong and that any probable cause which the United States had to indict "was a result of evidence that was deliberately tampered with and made by the DEA and/or its operatives" (allegations nos. 31, 33, 34 and 37). The following liability allegations zero in on the United States: "the USA was the legal cause of plaintiff's indictment because its duly authorized agent, AUSA Henwood, through the use of a Grand Jury, wrongfully indicted plaintiff;" "because the USA indicted the plaintiff with deliberately tampered evidence that was made by their agents the entire process against plaintiff was vexatious and abusive;" and, "the United States knew or should have known that the recorded conversations . . . were intentionally doctored copies . . . that the tapes were deliberately tampered with . . . and thus, the indictment was based upon

CIVIL 12-1605CCC                    2

evidence that was doctored . . . that the tapes were counterfeit and that the indictment . . . was based upon evidence that was manufactured." (See allegations 27, 38, 39, 45, 46 and 50).   Plaintiff further claimed at allegation No. 41 that "[t]he criminal case terminated in [his ] favor . . . by way of dismissal of the indictment on September 28, 2009."

## PROCEDURAL BACKGROUND

Plaintiff's malicious prosecution claim was tested by the United States by way of a motion to dismiss (d.e. 29) filed on April 22, 2013, opposed by Armstrong on May 30, 2013.  An Opinion and Order issued on March 31, 2014 (d.e. 45) addressed defendant's contention that Armstrong failed to state a malicious prosecution claim, the only remaining claim in this FTCA lawsuit. Other claims of false arrest and false imprisonment were dismissed in that Order, following the reasoning in Wallace v. Kato, 127 S.Ct. 1091, 1095 (2007), that "since both false arrest and false imprisonment consist of detention without legal process, they end once the person becomes held pursuant to such process, when for example he is bound over by a magistrate or arraigned on charge" and "[i]f there is a false arrest or false imprisonment claim, damages for these claims cover the time of his detention up until the issuance of process or arraignment but not more."   It was determined that the 2-year statute of limitations for the filing of the false arrest and false imprisonment claims began to run at least as far back as August 10, 2006, when Armstrong made his initial appearance before a U.S. Magistrate-Judge in this District.  He did not present these two FTCA claims until March 29, 2010, way beyond the applicable 2-year limitations period after  accrual, therefore both were declared barred for failure to comply with 28 U.S.C. § 2401(b).  As to his FTCA claims of abuse of

CIVIL 12-1605CCC                              3

process, negligence and intentional infliction of emotional distress, the record reveals that plaintiff never presented such claims to the agency, thereby triggering their dismissal for failure to exhaust administrative remedies, as required by 28 U.S.C. § 2675(a).

The dismissal motion was, however, denied as to the claim for malicious prosecution. Although Barros v. Villahermosa, 642 F.3d 56 (1st Cir. 2011) establishes that failure to prove any of the four elements of a malicious prosecution claim is dispositive, González-Rucci v. United States, 405 F.3d 45, 49 (1st Cir. 2005), held that it is sufficient to rebut the presumption of probable cause based on the issuance of a grand jury indictment if, at the pleading stage, allegations are made that law enforcement defendants wrongfully obtained the indictment by knowingly presenting false evidence to the grand jury. The malicious prosecution claim survived precisely because allegations 37 and 39 of the Amended Complaint averred that the indictment was obtained by presenting to the grand jury "tampered or made evidence" and "evidence that was doctored."

The case then moved on to a pretrial conference. An amended proposed pretrial order was jointly filed by the parties on September 12, 2013 (d.e. 40). A year later, on September 3, 2014, plaintiff filed an Amended and Reduced Witness List as per Court Order (d.e. 53). Of the nine trial witnesses there listed, plaintiff did not present the testimony of the following: DEA Special Agent Ryan Johnson (described in the amended proposed pretrial order as responsible for examining the tapes at issue to compare with plaintiff's known voice), Alexander Duffis Young (the confidential informant in Criminal No. 04-250(JAG) who plaintiff claims did the actual tampering of the audio recordings) and Larene Samuels and Natalie Haynes (as to whom no

CIVIL 12-1605CCC                    4

information was provided other than a reference next to their names to "Bank of Jamaica.")  These last two witnesses were included in the earlier amended proposed pretrial order (d.e. 40) filed a year before.  The proffer then provided was that they were civilians expected to be knowledgeable about plaintiff's lawful business life, business ventures and banking in Jamaica and would establish his relative wealth, lifestyle and reputation before being indicted.

The bench trial on the malicious prosecution claim commenced on February 23, 2016.  Plaintiff presented five witnesses: James Griffin, DEA Special Agent Vincent Carpio, Armstrong himself, Assistant U.S. Attorney Timothy Henwood and defense attorney Juan R. Acevedo-Cruz.  Plaintiff submitted as an exhibit a February 16, 2007 1-page letter from Assistant U.S. Attorney Henwood regarding Giglio materials.  Both parties submitted Joint Exhibits I to XX, which are core documents filed in Criminal No. 04-250(JAG), such as the criminal complaint that resulted in his arrest warrant, the indictment, transcripts of suppression hearings, Report and Recommendation of the U.S. Magistrate-Judge on the suppression issue, subsequent Court order adopting it and the judgment of discharge in Criminal No. 04-250(JAG).  Also admitted as Joint Exhibits were relevant documents filed in Criminal No. 09-309(JAG) in which  Armstrong entered into a plea agreement pursuant to which he pled guilty to an information.  Finally, there are four Court exhibits marked as I through IV, specifically the transcript of the grand jury testimonies of DEA Special Agent Vincent Carpio and of C.I. Alexander Duffis-Young, the case agent and the informant in Criminal No. 04-250(JAG), Armstrong's motion for change of plea and the transcript of that change of plea hearing in Criminal No. 09-309(JAG).

CIVIL 12-1605CCC                               5

Plaintiff completed his presentation of evidence during the bench trial on February 26, 2016. At the close of evidence, the United States made a verbal motion for judgment pursuant to Fed. R. Civ. P. 52(c). It argued that two of the four essential elements of a malicious prosecution action were missing: (1) the action did not conclude in a favorable manner to plaintiff and (2) the element of malice which requires proof of knowingly submitting false information was also lacking. Government counsel argued that the grand jury testimonies of DEA Special Agent Vincent Carpio and of the confidential informant as well as the criminal complaint and supporting Carpio affidavit filed in Criminal No. 04-250(JAG) (Joint Exhibit I) met the standard of probable cause to indict. Plaintiff counters that the information to which he pled guilty was for a misdemeanor that charged him with influencing a grand jury. He describes this as a second offense that was a consent charge and alleges that the information charging said offense lacked a factual basis. He, therefore, contends that Criminal No. 04-250(JAG) in which he was indicted for a drug conspiracy and money laundering terminated in his favor since the information was not a continuing, related part of the initial grand jury indictment.

Our analysis will focus on the two grounds for dismissal advanced pursuant to Rule 52(c). Having considered the evidence presented in this case, comprised not only of the testimony of witnesses at the bench trial and the assessment of their credibility but also the transcriptions of the grand jury testimonies of case agent Carpio and confidential informant Alexander Duffis-Young and the relevant documents that are part of the case files of Criminal Nos. 04-250(JAG) and 09-309(JAG), including the suppression hearing held in Crim. No. 04-250(JAG), the Court makes the following:

CIVIL 12-1605CCC                          6

## FINDINGS OF FACT

(1)   Armstrong owned several businesses, including 2 check-changing stores and a money lending store located in Montego Bay, Jamaica, and 4 "cambios" or money exchange stores.  Plaintiff testified that he owned all of these businesses in his individual capacity, that the 4 "cambios" or money exchange stores were regulated by the government of Jamaica and that a license was issued by the Bank of Jamaica in his name. According to his testimony, he started the money exchange business in 1993 with one store in Montego Bay at 13 Barnett Street and approximately by 1998 he had all 3 other money exchange stores running, 2 in Montego Bay and 1 in Spanish Town, Jamaica.  The government regulation of the money exchange stores involved audit every 6 months to ensure that he and his staff complied with license rules.  (Transcript Armstrong's trial testimony, pp. 5-11)

(2)   On May 25, 2004, a criminal complaint was sworn to by Special Agent DEA Vincent G. Carpio as investigating agent before Chief U.S. Magistrate-Judge Arenas of this District.  This affidavit (Joint Exhibit XX) mirrors the testimony subsequently provided by Carpio before the indicting grand jury in Criminal No. 04-250(JAG) against Armstrong, a.k.a. "Ruddy", Owen Livingston a.k.a. "John Gotti" and Neville Claude-Hue, a.k.a. "Flipi." The Carpio affidavit in support of the criminal complaint relates to the following events: (1) the negotiations of a 2 kilogram heroin transaction to be transported via a crew member of the Galaxy cruiseship from Aruba to Puerto Rico arriving on February 13, 2004; (2) the method of payment of the narcotics which was allegedly coordinated with Armstrong and Chris Chow, co-owners of the money exchange store Grand Central Cambio in Montego Bay, Jamaica and one "Basil;" (3) the negotiation between the confidential source and Armstrong

CIVIL 12-1605CCC                    7

on the percentage that Armstrong would charge for the payment of the drugs, (4) the delivery of the drug money to  co-defendant Livingston's wife by Grand Central Cambio where she went to collect the money and provided a receipt for the same.

(3)   Armstrong was arrested on June 19, 2004 and taken to the narcotics office of the Jamaican police in Kingston.  He testified that "members" of the U.S. government were not involved in his arrest but that a person who introduced himself as Eric Hill, a DEA agent stationed in Jamaica, was at the narcotics office when he was taken there.

(4)   A Grand Jury empaneled in this District heard the testimony of DEA Special Agent Carpio and of confidential informant Alexander Duffis Young regarding the investigation of three individuals, Livingston a.k.a. "John Gotti," Armstrong, a.k.a. "Ruddy" and Claude-Hue a.k.a. "Flipi,"[1] as to whom it issued a two-count indictment on June 27, 2004 in Criminal No. 04-250(JAG). The relevant period for both counts is from on or about November 2003 up to and including April 2004.  The first count charges a conspiracy to import into the United States one (1) kilogram or more of heroin and the second count charges that defendants engaged in monetary transactions through a financial institution involving the transfer of U.S. currency exceeding the sum of $10,000.00 which was property derived from a specified unlawful activity, the importation of a controlled substance.

(5)   The crucial moment underlying the malicious prosecution claim is June 23, 2004 when A.U.S.A. Timothy Henwood presented evidence to the

---

[1]The testimonies of the two government witnesses who appeared before the Grand Jury were procured by an Order issued in this civil action on February 22, 2016 (d.e. 83) pursuant to 18 U.S.C. § 3322(b)(2).   The transcriptions of the Carpio and Young testimonies were admitted as Court Exhibits I and II in this case.

CIVIL 12-1605CCC                          8

indicting grand jury in Criminal No. 04-250(JAG). The only two witnesses who testified before the grand jury were case agent Carpio and confidential informant Alexander Duffis Young. There was only one session before the grand jury, that of June 23, 2004. A review of the transcription of the grand jury proceedings compels the fundamental finding that neither of the audio recordings identified as N-17 and N-18, challenged by plaintiff as "doctored," "manufactured," "counterfeit" and "fabricated," were played, or their transcripts read, to the indicting grand jury, nor submitted as grand jury exhibits. Assuming, arguendo, that there was tampering, there is an absence of proof to support the claim that the United States, either through the prosecutor in charge of the investigation (Henwood) or the case agent (Carpio), had knowledge that any tampering of the recordings had occurred or that Henwood or Carpio procured, instigated or instructed the confidential source to engage in any such wrongdoing. The evidence proves the contrary.

(6)  This was a legitimate law enforcement investigation that yielded incriminating evidence against Armstrong sufficient for a grand jury to find probable cause and to return an indictment charging him and two others with conspiracy to import one (1) kilogram or more of heroin and engaging in money laundering transactions that involved property allegedly derived from the importation of the heroin. Case Agent Carpio as plaintiff's trial witness in this civil action described the scope of the criminal investigation that had ended prior to his testimony before the grand jury. He explained that "[t]he information that we collected from different investigations that were going on at the time, there were arrests in Tampa . . . and in Miami as well . . . people were extradited from Jamaica and Colombia to Miami who pleaded to charges and who were cooperating at the time, indicating that Armstrong was the

CIVIL 12-1605CCC                    9

person who facilitate[d] the payments for all the drug transactions according to that network." Transcript Carpio trial testimony, p. 129, lines 15-23; that "the actual probable cause was the coordination efforts that were done by the network to pick up the money in Miami and deliver it to the targets in Jamaica by Mr. Armstrong."  Id., p. 134, lines 15-18.  He explained that the conversations with Armstrong recorded by confidential informant Alexander Duffis Young were not the only evidence that the government had to indict Armstrong on drug conspiracy and money laundering charges.  He referred to surveillance that had been conducted and to recordings, other than the two found to be inadmissible in Criminal 04-250(JAG), which had been made of other conversations with Armstrong's associates.  He also alluded to evidence that had been seized as a result of a search warrant executed at Armstrong's residence in Jamaica incidental to his arrest.

> Regarding this search warrant, Carpio testified in this case that: "[t]here was a laptop containing several financial transactions with different traffickers to include one transaction that we did with him for the portion of the heroin in Aruba."

Trial transcript, p. 140, lines 20-23.

> The information for this search warrant executed at the time of his arrest was information we obtained from the office in Jamaica. Agent Eric Hill was the case agent of that portion of the investigation.

Id., p. 141, lines 5-10.

> I remember there was a computer, I believe it was a laptop.  And that was examined at our office in D.C., DEA Office Headquarters. They found several transactions with different trafficker organizations . . . and some of those transactions included the one that we did here in Puerto Rico . . . the transaction that we conducted here in Puerto Rico with Mr. Armstrong.

Id., p. 141, lines 23-25; p. 142, lines 1-10.

> . . . the transaction with the $10,000, it was also a document in the computer; that's the actual drug transaction that we conducted with Mr. Armstrong and a gentleman from Aruba.  We purchased 1 kilo

CIVIL 12-1605CCC                    10

> of heroin and we paid $10,000.00.  Mr. Armstrong is the one who received the funds.  He took a 10% cut from the $10,000.00 and delivered the rest of the money, if I remember correctly to the gentleman in Aruba's wife in Jamaica.

Id., p. 142, lines 18-25; p. 143, lines 1-2.

The criminal investigation that led to Armstrong's June 23, 2004 indictment in Crim. No. 04-250(JAG) included evidence not only of negotiations on the cut Armstrong was to be paid on the drug down payment but also of the delivery of money to codefendant Livingston a/k/a Gotti's wife (Suphie) at Grand Central Cambio in Jamaica.  The government's evidence placed Suphie at the money exchange business owned by Armstrong, where she received the drug money, thereby culminating that part of the transaction and of the conspiracy charged in Count One of the Indictment, as it related to Armstrong and the movement of the drug money.

(7)   The information provided and the events testified to by case agent Carpio during the civil trial are convincing evidence that the **criminal investigation** conducted in 2003-2004 by the DEA, spanning activities in Aruba, Jamaica and Florida related to the Aruba/Puerto Rico importation of heroin, did not depart from proper parameters of a law enforcement investigation.  On the contrary, the evidence supports the finding that this was a bonafide criminal investigation and that neither the investigating agent who testified before the grand jury nor the prosecutor who presented evidence before it engaged in improper investigative or prosecutorial practices that jeopardized the integrity of the grand jury's investigation. As will be later discussed, the fact that two audio recordings were found to be inadmissible as trial evidence in the criminal case does not vitiate either the grand jury proceedings or the investigation that preceded the presentation of testimony

CIVIL 12-1605CCC                    11

to obtain an indictment against Armstrong and two others on a drug and a money laundering conspiracy.

(8)   This same finding applies to the legitimacy of the **grand jury proceedings** that followed.  During the presentation of evidence before it the grand jury heard testimony of two witnesses: investigating agent Carpio and confidential informant Alexander Duffis Young.  Carpio told the grand jury (Court Exhibit I) that his agency started an investigation involving three individuals: Livingston (Gotti), Armstrong (Ruddy) and Claude Hue (Flipi); that a confidential source was introduced into a Jamaican drug organization with operatives in Aruba; that an undercover task force agent was used to infiltrate the organization in Aruba and they were able to negotiate a sale of heroin to be brought into Puerto Rico from Aruba; that as part of the investigation they were aware that Armstrong and his people in Jamaica were in charge of laundering proceeds from the United States and Europe through Jamaica to Panama and Colombia; that the Jamaican drug trafficking organization's main objective was to smuggle heroin into Puerto Rico, Miami and other areas. Using a map of the Caribbean, Carpio told the grand jurors that the area basically indicated the location of  Livingston (Gotti) in Aruba and of Claude Hue (Flipi), identified as one of Armstrong's workers, and of Armstrong (Ruddy) in Jamaica.  He continued testifying that: (1) Livingston (Gotti) offered his facilities to smuggle the heroin from Aruba into Puerto Rico as he had done in the past; (2) methods of payment were discussed with Livingston during the negotiations to bring the drugs into Puerto Rico and he agreed to a percentage on the deal; (3) during negotiations between the undercover agent and Livingston he was told that "the money is stored in Jamaica, the Grand Central Cambio, owned by Mr. Armstrong . . . who had the facility to transport money

CIVIL 12-1605CCC                    12

from anywhere in the United States to Jamaica or anywhere in the world for that matter," and, (4) Armstrong could be contacted; (5) Livingston was asked if he would be in a position to pick up the money . . . that the money for these drugs was in Miami, and that he agreed to a percentage on the deal; (6) after that they continued to negotiate with Livingston to bring the drugs into Puerto Rico; (7) Livingston was supposed to deliver 2 kilograms of heroin via crewmembers of the Galaxy cruise ship; (8) he agreed to the deal and was paid $10,000.00 as down payment for the drugs.  Asked by prosecutor Henwood about specifics of the criminal investigation, S.A. Carpio went back to November 2003 and said the following to the grand jury: that he, the confidential source and an undercover agent traveled that month to Aruba and met with Livingston to discuss the shipment of the drugs at which time Livingston said that he had a means to transport the drugs from Aruba to Puerto Rico; during that meeting they also discussed payment of the drugs and Livingston was told that they had the money in Miami and the contacts in Jamaica to be able to transport the money; that Livingston then said that he recognized the people that they were talking about, that they had done business in the past or somehow Livingston had word that that money store was in place to be able to facilitate the protection of currency; that negotiations with Livingston occurred between November 2003 and January 2004 and in February 2004 the payment of the $10,000.00 was made: that they had talked to Livingston and that he needed the $10,000.00 for the down payment; that he would be able to ship the drugs on Wednesday because the Galaxy cruise ship leaves Wednesday from Aruba and arrives in Puerto Rico on Friday; that they told Livingston they were going to call Armstrong in Jamaica and they were going to make payment in Miami; that they called Armstrong and talked

to Chris Chow, one of his coworkers who gave them a number for Neville
Claude Hue (Flipi) in Miami and in Miami they used an undercover agent who
dropped the $10,000.00 to Claude Hue and that "there was a conversation with
Mr. Armstrong after the money dropped and he said he would charge us 10%
of the $10,000.00 because that amount being too small he needed to pay the
couriers to bring the money back to Jamaica, so contact was made in Jamaica
with Armstrong and he provided or a number was provided through the Central
Cambio in Jamaica for an individual named Neville Claude Hue in Miami and
money was delivered to Neville Claude Hue in Miami; that the $10,000.00 was
to secure down payment for the 2 kilograms of heroin and after that the heroin
would be released by Livingston in Aruba, the money got dropped off in Miami
and they called Armstrong back to say that it is paid in Miami and called
Livingston and said that "we got payment in Miami already . . . Armstrong
already has it;" Livingston answered that he would send the number of his wife
Suphie in Jamaica and that she would pick up the money; that another member
of the organization, "Mr. Basil," took Suphie to the Grand Central Cambio, gave
her the money, and that "Basil" was asked to make Suphie sign the money
released to her; that she signed a piece of paper acknowledging that she
received $9,000.00 from Grand Central Cambio; that Livingston was contacted
to verify that his wife got the money and he said "Yes my wife called me.  She
says she got the money.  I would send you the drugs now;"  that when the
couriers arrived on Friday on the Galaxy, they were not able to come down
from the ship and they called Livingston and he said the guy could not come
down for some reason and was going to come back to Aruba and he would talk
to him and "we'll go on the next trip;"  that on February 11, Gotti said that the
drugs were on the way.  Carpio ended his testimony before the grand jury

saying that "throughout all the investigations, all the conversations between Livingston and the confidential source and the undercover, Adrian Armstrong, all the conversations were recorded."

(9)   None of the recorded conversations, however, were played to the grand jury.  The transcription of the one-day grand jury proceeding recorded reflects that the only exhibit submitted to the grand jury's consideration was a map of the Caribbean area.[2]  (Grand Jury transcript, June 26, 2014, p. 3; Court Exhibit I).  The grand jury testimony of C.I. Alexander Duffis Young was based on his own recollection of phone conversations that he had with Armstrong and others, targets of the investigation, regarding the movement of money during the drug and money laundering conspiracies.  On his part, Carpio provided information to the grand jury that was obtained from sources during his agency's  investigation.  He referred to actions known to the sources to have been taken, such as the use of an undercover agent in Miami to drop off the money ($10,000.00) to defendant Neville Claude-Hue and made mention of several conversations recorded during the span of the investigation, not conversations recorded only by C.I. Alexander Duffis Young but also by an undercover agent in Miami and by an undercover Task Force agent in Aruba. (Grand Jury transcript, June 26, 2014, pp. 4, 7, 12; Court Exhibit I).

(10) Armstrong has repeatedly raised in this civil action that false evidence was presented to the grand jury in the form of recordings N-17/N-18 of his conversations with the C.I.   This argument is flawed.   The record disavows Armstrong's claim that tapes N-17 and N-18 were submitted to the grand jury during the presentation of evidence. His fabrication claim has not

---

[2]The disclosure of the grand jury proceedings recorded was authorized by Court Order pursuant to Fed. R. Crim. P. 6(e)(3)(E).

CIVIL 12-1605CCC                              15

been established by a preponderance of the evidence.  It is based on two false premises without which the element of malice is not present as a component of his malicious prosecution claim.  The first premise, that federal agents A.U.S.A Henwood and S.A. Carpio had  knowledge of fabrication or tampering related to the two recordings, has been discussed and discarded.  The second premise that the two recordings claimed to be altered were presented to the indicting grand jury is defeated by our prior determination that what actually transpired was that the C.I. narrated what he remembered of his conversations with Armstrong and others.  Armstrong, on his part, acknowledged during his trial testimony in this case that:  (1) he did speak with C.I. Alexander Duffis Young during the criminal investigation that led to his indictment, (2) he was familiar with the C.I's voice and knew that it was Duffis Young who was speaking to him, (3) he identified his own voice as one of the speakers in both N-17 and N-18, and (4) he identified the voice of the third speaker in N-17 as that of "Basil."  "Basil's" name was mentioned by S.A. Carpio as a member of the drug organization when he testified before the grand jury on the movement of money related to the heroin shipment charged in the indictment.  This is the same name mentioned by Armstrong during his trial testimony.

(11) As to this matter, Armstrong gave the following trial testimony regarding the voices that he identified in N-17 and N-18:

> ARMSTRONG: I told Mr. Acevedo that these tapes – I did not trust the integrity of these tapes and I had my suspicions and reasons to suspect that they were edited.
>
> . . . .
>
> THE COURT: Was – did you recognize your voice on – listen to my question.  Did you recognize your voice on the recording identified as tape N-17?
>
> ARMSTRONG: Yes, Your Honor.

CIVIL 12-1605CCC                    16

THE COURT: And did you recognize the voice of the other speaker?

ARMSTRONG: Yes, Your Honor.

THE COURT: Who was that other speaker?

ARMSTRONG: Alexander Duffis Young

THE COURT: I'm talking about N-17.  You're clear?

ARMSTRONG: Yes, Your Honor.

THE Court: Anybody else was a speaker on that recorded conversation?

ARMSTRONG: Basil.

THE COURT: Hmm?

ARMSTRONG: Basil.  Basil.

THE COURT: How do you spell that?

ARMSTRONG: B - a - s - i - l.

THE COURT: And there was a third speaker who you identify as Basil?

ARMSTRONG: BASIL, B - a - s - i - l.

THE COURT: You identified him to Mr. Acevedo, your attorney, at that time?

ARMSTRONG: The voices?

THE COURT: Mm-hmm

ARMSTRONG: He never – no, I didn't identify the voices to Mr. Acevedo at the same time, Your Honor.

THE COURT: But my question is if when you listened to those tapes you recognized your voice in N-17?

ARMSTRONG: Yes, I did, Your Honor.

THE COURT: Did you recognize your voice when you first listened – the question is first listened to the recorded conversation on tape N-18?

ARMSTRONG: Yes, Your Honor.

CIVIL 12-1605CCC                         17

    THE COURT: And when you recognized the voice of the person you identified as Alexander Duffis Young, was that on the first time that you listened to N-17?
    ARMSTRONG: Yes, Your Honor.

    THE COURT: And when you recognized the voice of the third speaker that you mention is Basil, was that on the first time that you listened to N-17?

    ARMSTRONG: Yes, Your Honor.

    THE COURT: All right.  You said you recognized the voice – your voice the first time you listened to N-18.  And what about the – any other speaker on recorded conversation at tape N-18, the first time you listened?

    ARMSTRONG: I recognized Alexander Duffis Young's voice.

    THE COURT:  Any other speaker that you recognized when you listened for the first time to the conversation recorded as tape N-18?

    ARMSTRONG: No, Your Honor.

    THE COURT: Was there a third speaker –

    ARMSTRONG: No, Your Honor.

    THE COURT: – on N-18?

    ARMSTRONG: No, Your Honor.

Transcript of Armstrong's trial testimony on February 25, 2016, p. 26, line 16 through p. 29, line 1.

    (12) The following are relevant excerpts of S.A. Carpio's grand jury testimony related to calls/contacts made and conversations held during the criminal investigation:

    A.U.S.A. HENWOOD: Okay, Now I'm going to turn your attention to an investigation involving individuals known as Owen Livingston a/k/a "John Gotti," Adrian Armstron a/k/a "Ruddy" and Neville Claude Hue a/k/a "Flippy."  Are you familiar with that investigation?

    CARPIO: Yes, I am.

    A.U.S.A. HENWOOD: And how are you familiar with it?

CIVIL 12-1605CCC                                     18

> CARPIO: During November of 2003 we start an investigation on a Jamaican organization based in Jamaica that has some operatives in Aruba.  The main purpose was to smuggle heroin into Puerto Rico, Miami, U.S., and other areas.  At the same time we were aware of Armstrong and his people in Jamaica are in charge of laundering proceeds from the U.S., Europe through Jamaica back to Panama and Colombia.

S.A. Carpio's grand jury transcript, Court Exhibit I, p. 2, line 20 through p. 3, line 12.

> A.U.S.A. HENWOOD: Were you able to use a confidential informant in this case?

> CARPIO: Yes.  We introduced a confidential source to be introduced to the organization that was operating in Aruba.  We used an undercover Task Force agent, where we were infiltrating in Aruba and we were able to negotiate the sale of heroin to be brought into Puerto Rico.  The guy, Owen Livingston a/k/a "Gotti," he offered that he has the facilities to smuggle heroin from Aruba into Puerto Rico.  That he has done it in the past many times.  We discussed payment, methods of payment, with him.  We told him that the money's stored in Jamaica, the Grand Central Cambio, all by Mr. Armstrong.

S.A. Carpio's grand jury transcript, Court Exhibit I, p. 4, lines 3-19.

> CARPIO:  We use an undercover agent in Miami to drop the money to Neville Claude Hue.  We dropped $10,000.  There was a conversation with Mr. Armstrong after the money drop and he said he would charge us 10% of the $10,000 because that amount being too small he needed to pay the couriers to bring the money back to Jamaica.

> A.U.S.A. HENWOOD: So, contact was made in Jamaica with Armstrong and he provided or a number was provided through the Central Cambio in Jamaica for an individual named Neville Claude Hue in Miami . . .

> CARPIO: Correct.

> A.U.S.A. HENWOOD: . . . and money was delivered to Neville Claude Hue in Miami?

> CARPIO: Correct.

> . . .

> CARPIO: We call Mr. Livingston and say, okay, we got payment in Miami already.  Armstrong already has it.  So. Mr. Livingston say, okay, I want to send you the number of my wife in Jamaica, Suphie, and she can pick up the money.  And we talk about the

CIVIL 12-1605CCC                    19

>money and stuff.  You're only going to pick up $9,000 because
>10% was charged by Armstrong because being this small amount
>he's going to charge 10% this time.  Future shipments of money
>would be charged by 6%.  Suphie shows up in Jamaica.  Another
>member of the organization, Mr. Basil (phonetic), takes Suphie to
>the Grand Central Cambio, give the money.

S.A. Carpio's grand jury transcript, Court Exhibit I, p. 7, lines 7-21; p. 8,
lines 11-25.

(13)  Carpio's **trial** testimony mirrored his previous **grand jury** testimony
in 2004.  He repeated that he traveled to Aruba where the actual transaction
for the drug and the money was conducted between the 2003/2004 time
period.  As before, he testified at trial that a search warrant had been executed
at Armstrong's residence in Jamaica at the time of his arrest (Transcript of
Carpio's trial testimony, p. 140); that the information for the search warrant was
obtained from the DEA office in Jamaica and that Agent Eric Hill was the case
agent on that portion of the investigation (id., pp. 140-141).  He further testified
that he remembered when Armstrong was arrested and that, as a result of the
search warrant, a computer was seized and examined at the DEA office
headquarters in D.C.; that documented in this computer was a $10,000.00
transaction with Armstrong, which Carpio described as the actual transaction
conducted with Armstrong and a gentleman from Aruba when the DEA
purchased 1 kilogram of heroin and paid $10,000.00.  Id., p. 142.  He further
testified at trial that this was the transaction in which Armstrong received the
funds, took a 10% cut from the $10,000.00 down payment and delivered the
rest to the gentleman's wife in Jamaica.

(14)  Early on in his testimony, Carpio observed that the investigation had
revealed that "Armstrong was involved in the facilitation for payment of drug
shipments from Colombia to Jamaica and Miami" (Transcript of S.A. Carpio's
trial testimony on February 24, 2016, p. 127) and that Alexander Duffis Young

CIVIL 12-1605CCC                    20

was recruited as a confidential informant.  The information that the agency collected as to Armstrong did not come only from Alexander Duffis Young but from different investigations going on at the time for "[t]here were people that were extradited from Jamaica and Colombia to Miami, Florida and those defendants pleaded to the charges and were cooperating at the time, indicating that Mr. Armstrong was the person who facilitates the payment for all the drug transactions according to that network."  Id., p. 129, lines 18-23.

(15)  Armstrong had announced C.I. Alexander Duffis Young as a trial witness in this case.  He is the one whom Armstrong accuses of creating the false evidence, N-17 and N-18.  He was also the only other witness besides S.A. Carpio who appeared  before the Grand Jury on June 23, 2004.  His name was not included, however, in plaintiff's final reduced trial witness list.  Therefore, the Court can only refer to the essential parts of his grand jury testimony (Court Exhibit II).

Alexander Duffis Young was born in San Andres Island in Colombia and moved to Jamaica in 1998.  He had been charged in this jurisdiction in a drug conspiracy involving 5 or more kilograms of cocaine.  In 1994-1995, he helped "some drug dealers to exchange in U.S. money in San Andres island" and in 1996 he started helping in the traffic of cocaine from Colombia to Guatemala.   In 1998 he was based in Jamaica and until 2003 he was trafficking drugs and moving money through Jamaica.

Regarding the investigation that led to the indictment in Criminal No. 04-250(JAG), Alexander Duffis Young testified that:

(a)   He started cooperating with the United States in August 2003 and in November 2003 he was working with the DEA and "we went to meet a guy

CIVIL 12-1605CCC                    21

in Aruba on behalf of another trafficker I know in Jamaica . . . that was John Gotti;"

    (b)   He went to him in Aruba to talk of business for Roger Edwards, moving some cocaine from Curacao to Puerto Rico;

    (c)   During this meeting this guy whom he identified as John Gotti . . . Owen Livingston, came up and said he could move heroin from Aruba to Puerto Rico;

    (d)   At that meeting he was directed by the DEA; that he kept in contact with Owen Livingston who said he had some heroin to send to Puerto Rico but needed a deposit to get this heroin;

    (e)   Owen was going to get it from another Colombian and needed a deposit because he was going to get the heroin on consignment which meant that he was going to do a down payment to get the heroin;

    (f)   Owen told him he could get the money in Jamaica and he (Duffis) told him he had the money in Miami and he was going to talk with "Ruddy" in Grand Central;

    (g)   "Ruddy is a guy that would move money in drug trafficking . . . that he owns Grand Central Cambio in Jamaica and that he always brings money, from $500,000.00, $200,000.00, he always do that for me from Miami and charges a percentage;"

    (h)   He (Duffis) told Ruddy he was going to do business with a friend from Aruba ("Gotti") and he needed to get some money in Jamaica to be able to do his business so . . . "I dropped off the $10,000, DEA dropped off money to Ruddy;

    (i)   Ruddy instructs us to give the money to Flipi, he gives us a number and his partner, Chris Chow, was right at the 'Cambio' that day;

CIVIL 12-1605CCC                          22

(j)     So he gives us the number and then confirms with Ruddy that that was the number of the person that was going to bring them the money, take out the money in Miami."  Answering prosecutor Henwood's questions "What was Armstrong a/k/a Ruddy going to make throughout this entire transaction?," he answered: "I have an old debt with him, drug debt with Ruddy and I told him I'm going to do this business so when this business finishes I'm going to give him $20,00.00 of the business plus he is going to charge me 6% for the rest of the money, to move the money.  We was looking on the business, getting $120,000.00 . . . so I told him he's going to get $20,000.00 for his old debt and he's going to charge me 6% to move the rest of the money of that business. The first time I met Ruddy he told me that to move the money to the U.S. went up, he told me it went up . . .  to 8% so I give him a second call and tell him I'm going to give you $20,000.00, so I need you to drop that percentage, so that's when he said o.k., he'll leave it at 6%."  He was then asked by the prosecutor if there came a time when the money was delivered to Neville Claude Hue a/k/a "Flipi" in Miami and if he had had conversations with him and he answered yes to both questions.

(16)  The next Duffis-Young testimony about  picking up the money and the payment is at pages 11-13 of the transcription of his Grand Jury testimony (Court Exhibit II):

> DUFFIS YOUNG: So, when I called him [referring to Flipi] I said this is Alex, this is "Ruddy" and Chris' friend.  So, he said, okay, it's different now because it's problem to get the money.   I said $10,000 you have no problem to pick up.   He said no, there is problem, even with $10,000.  They have to make sure he's talking to the right people.
>
> A.U.S.A. HENWOOD: So, he was concerned with who he was dealing with in picking up that money?
>
> DUFFIS YOUNG: Yeah, he don't want to be – if it was police or something like that.

CIVIL 12-1605CCC                        23

A.U.S.A. HENWOOD: All right.  And so the money is transferred to Neville Claude Hue in Miami and then there is a credit at the Central Cambio . . .
DUFFIS YOUNG: Grand Central Cambio.

A.U.S.A. HENWOOD: . . . in Jamaica and $9,000 is provided?

DUFFIS YOUNG: Yes, they told us if the amount is $10,000 they have to charge us 10%, because they don't move those amount of money.  So, I call "Ruddy" and tell him "hey, you have to charge me that amount?"  He said yes because he have to pay the people, the people that pick up at the same time.

A.U.S.A. HENWOOD: Okay.  So, when he says he has to "pay the people" he's referring to the people in Miami?

DUFFIS YOUNG: Yeah.  So, I told him, it's my guy, referring to "Gotti," so he have to work with $9,000.  And he said "yes, my guy has to work with $9,000," and I told "Gotti" it was $9,000 because they charged $1,000.  That's why.

A.U.S.A. HENWOOD: All right.  So, then that $9,000 is released to who in Jamaica?

DUFFIS YOUNG: To "Gotti," "Gotti's" girlfriend or wife.

A.U.S.A. HENWOOD: And what was her name?

DUFFIS YOUNG: Suphie.

A.U.S.A. HENWOOD: Suphie.  And did you contact "Gotti" after the money was released?

DUFFIS YOUNG: I contact Suphie.  I ask Suphie if she went to "cambio" and she said yes she went to the "cambio" and pick up the money and I called "Gotti" and told "Gotti" the same.

A.U.S.A. HENWOOD: All right.  And then "Gotti" told us that he would be releasing the heroin  on the Galaxy cruise ship?

DUFFIS YOUNG: On the Galaxy.

Alexander Duffis Young's Grand Jury transcript, Court Exhibit II, pp. 11-13.

(17)  The criminal investigation and the testimonial evidence presented to the grand jury led  to the filing of charges on June 23, 2004 in Criminal No. 04-250(JAG) against Owen Livingston aka "John Gotti," Adrian Armstrong aka "Ruddy"and Neville Claude-Hue aka "Flipi"  for conspiring to import into the

CIVIL 12-1605CCC                    24

United States 1 kilogram or more of heroin and for aiding and abetting money laundering activities derived from the importation of the controlled substance charged in Count One which ended with the dismissal of this indictment after then defendant Armstrong pled guilty to a one count information for attempting to influence a grand jury and had been sentenced in Criminal 09-309(JAG).

(18)  During the pendency of Crim. No. 04-250(JAG), Armstrong filed a "Motion to Dismiss the Indictment or Suppression of Evidence" on May 17, 2007 (d.e. 146 in Crim. No. 04-250(JAG)), later supplemented on May 21, 2008 (d.e. 225 in Crim. No. 04-250(JAG)).  Armstrong imputed in both motions that N-17 and N-18, two separate conversations between him and C.I. Duffis-Young, and recorded by the latter, had been tampered with. According to an analysis conducted by the expert retained by Armstrong, Mr. James A. Griffin, tape N-17 had a break at 3:34 minutes which could have resulted from a later editing of the tape.  Griffin also found that it ended abruptly before the conversation concluded.  As to tape N-18, Griffin found that the tape was an acoustically coupled copy of some other recording, which contained stops and starts of the recorder in several places and the sound of someone fumbling with the controls of some other device, most likely the playback device.  Griffin concluded that N-18 was not an original tape and that it did not contain a complete recording of a conversation but, rather, pieces of a conversation or of more than one conversation.  Armstrong adduced in support of dismissal of the indictment or suppression of the recordings that the tampering of both recordings must have been done by "either a government agent or someone acting on behalf of the government during the investigation." Motion to Dismiss, at p. 4.

CIVIL 12-1605CCC                          25

(19) Armstrong's motions were referred to U.S. Magistrate-Judge Camille L. Vélez-Rivé who, after conducting two hearings where the testimonies of Griffin and government experts Ryan Johnson and Barry Dickey were presented, rendered a Report and Recommendation (R&R) on December 30, 2008 (d.e. 257 in Crim. No. 04-250(JAG)).  She recommended that recording N-17 be suppressed but that the request for dismissal of the indictment be denied.  Recording N-18 was not addressed in said Report as the government informed that it would not introduce it in evidence. Magistrate-Judge Vélez-Rivé concluded that the government failed to establish that tape N-17 was "a true, accurate and authentic recording of the conversation, at a given time, between the parties involved,"  R&R, at p. 7, given that all experts agreed that "there is a gap in the conversation which length [could not] be estimated."  R&R, at p. 11.  She also highlighted that "all experts agree[d] that there [was] an abrupt stop at the end of the N-17 tape in the middle of a conversation while the conversation still appears to be in progress after approximately seven minutes and four seconds."  R&R, p. 11. Finally, she noted a discrepancy as to the date of the recording shown in its header, December 27, 2003, and the date when according to the government's Report of Investigation it actually took place, January 7, 2004.  She, thus, concluded that these anomalies made N-17 "unreliable."  As to the dismissal of indictment request, however, the Magistrate-Judge determined that: "The reasons for which we find that N-17 is unreliable . . . do not amount to outrageous government misconduct which was pervasive undermining the integrity of the investigation.  Moreover, the defense has not presented credible evidence that the recording in question N-17 was intentionally tampered with." R&R, p. 14.

CIVIL 12-1605CCC                    26

(20) Judge García-Gregory issued an Opinion and Order (O&O) on May 7, 2009  (d.e. 288 in Crim. No. 04-250(JAG)) which essentially adopted the factual findings and legal conclusions of the Magistrate-Judge.  He declared that N-17 was inadmissible as trial evidence in Criminal No. 04-250(JAG) given the government's failure to establish its accuracy.  He warned that "[t]he fact that a tape is inadmissible does not necessarily imply tampering" and specifically concluded that the various factors invoked by Armstrong as indicative of tampering did not constitute credible evidence of tampering. O&O, p. 12.  The reason for denying Armstrong's motion to dismiss the indictment was, precisely, because he failed to present "credible evidence of tampering."  O&O, at p. 13.  The suppression the N-17 tape ordered by Judge Garcia-Gregory was the appropriate remedy to guarantee Armstrong a fair trial in Criminal No. 04-250(JAG).

(21) The criminal case continued its progression towards trial.  Judge Garcia-Gregory held  a status conference on May 18, 2009, at which time he denied Armstrong's motion for reconsideration of the denial of his dismissal motion (d.e. 291/Crim. No. 04-250(JAG)).  The case moved forward to the July 14, 2009 trial setting.  The Court ordered the filing of proposed jury instructions. The United States filed a set of instructions.  This trial setting was continued at Armstrong's behest based on a claim of unresolved discovery issues.   During a July 2, 2009 status conference held by Judge Garcia-Gregory, the trial was reset for September 14, 2009.  The government's designation of evidence was filed on August 11, 2009 (d.e. 311), listing 18 items and 7 other recordings of conversations.  On September 1, 2009, Judge Garcia-Gregory held an emergency in-chambers conference at the parties' request.  He then granted a verbal request for continuance of the

CIVIL 12-1605CCC                    27

upcoming trial.   The reason for vacating the same was that Armstrong's attorney had been unable to prepare due to family matters and his involvement in another case that had lasted longer than expected.   The trial was rescheduled for September 29, 2009 (d.e. 314/Crim. No. 04-250(JAG)).   On September 14, 2009, the United States requested and the Court granted the dismissal of Count Two, the money laundering charge, as to co-defendant Armstrong.   Eight days later, Armstrong filed a change of plea motion on September 22, 2009 in Criminal 04-250(JAG)   (d.e. 322/Crim. No. 04-250(JAG)) where Armstrong "gives notice that he wishes to change his plea pursuant to an information and plea agreement to be filed with the Court." Court Exhibit III.

        (22)  A one-count information was filed by the United States Attorney of this District on September 23, 2009 for violation of 18 U.S.C. § 1504 (Joint Exhibit XII) which reads:



CIVIL 12-1605CCC                    28

The relevant portion of 18 U.S.C. section 1504 provides:

Whoever attempts to influence the action or decision of any grand or petit juror of any court of the United States, upon any issue or matter pending before such juror . . . by writing or sending to him any written communication in relation to such issue or matter shall be fined under this title or imprisoned not more than six months, or both.

(23) A plea agreement between the United States and Armstrong followed the next day. Armstrong's plea agreement, filed on September 23, 2009 in Criminal No. 09-309(JAG) and admitted as Joint Exhibit XIV in this civil action, had an accompanying statement of facts that was incorporated as part of said agreement. Paragraph 14 of the plea agreement, Joint Exhibit XIV, reads:

The accompanying Statement of Facts signed by the defendant is hereby incorporated into this plea agreement. Defendant adopts the Statement of Facts and agrees that the facts therein are accurate in every respect and, had the matter proceeded to trial, that the United States would have proven those facts beyond a reasonable doubt.

(24) The transcript of the change of plea hearing on the information (Court Exhibit IV of this case) reflects that Armstrong was personally addressed as the defendant regarding his understanding of his rights, the nature of the charge, the penalties. After this, the Court determined that Armstrong's plea was voluntary and that he had waived all of his trial rights with understanding of the same. The Court determined that there was a factual basis for Armstrong's plea of guilty to the information after the following colloquy:

THE COURT: Okay. And would counsel for the government give us the explanation of the theory, which is a version of facts attached to the plea agreement to prove defendant guilty if a trial were to be held?

A.U.S.A LOPEZ-SOLTERO: Yes, Your Honor. The government would have proven the defendant's guilt beyond a reasonable doubt, specifically that on February 9 of 2004, the defendant did

CIVIL 12-1605CCC                    29

> knowingly and intentionally attempt to influence the action or decision of a federal Grand Jury of the United States upon an issue or matter pending before that jury by providing federal authorities with an untruthful document. At that time the defendant was aware that the document he generated would be submitted before a federal Grand Jury investigating a violation of law.  The United States would have done this introducing documentary evidence, as well as through the testimony of witnesses.

> THE COURT: Very well.  And, Mr. Armstrong, do you agree with the government's version that you just heard?

> ARMSTRONG: Yes, Your Honor.

> THE COURT: And is this what you did?

> ARMSTRONG: Yes, Your Honor.

> THE COURT: And you still want to plead guilty?

> THE DEFENDANT Yes, Your Honor.

> THE COURT: So, how do you plead to the charge in the information before the Court, guilty or not guilty?

> ARMSTRONG: Guilty, Your Honor.

Transcript of Armstrong's change of plea hearing held on September 23, 2009 in Crim. No. 09-309(JAG), p. 15, line 23 through p. 16, line 25.

(25) His motion for change of plea was accepted during the September 23, 2009 hearing. The Court imposed sentence that same day consisting of the payment of a $500.00 fine and a $10.00 special monetary assessment for the 18 U.S.C. section 1504 violation.  Defendant never requested to withdraw his plea of guilty nor contested his plea on direct appeal. The record reflects that after the Court had accepted his plea of guilty on the U.S. Attorney's charge by way of information for attempting to influence a grand jury in violation of 18 U.S.C. § 1504 and had sentenced him on September 23, 2009,  after he was no longer in custody, Armstrong filed a year later, on September 28, 2010, a Motion Under 28 U.S.C. Section 2255 and for Writ of Coram Nobis to Vacate, Set Aside or Correct Judgment.  The presiding

CIVIL 12-1605CCC                    30

Judge in Criminal No. 04-250(JAG) and in Criminal No. 09-309(JAG), Judge Garcia-Gregory, issued an Opinion and Order denying the same.  This petition does not contain any statement that would raise concerns about the plea agreement procedure, the motion for plea of guilty pursuant to the plea agreement, the adequacy of the plea of guilty hearing or the factual basis for Mr. Armstrong's guilty plea to an information for attempting to influence a grand jury by providing federal authorities with an untruthful document which he knew at the time that he generated said document that the same would be submitted to a federal grand jury that was investigating a violation of law.

        (26)  The development of Criminal No. 04-250(JAG) from beginning to end reflects that the suppression of the two audio recordings did not halt the proceedings in that case.  Its case history is no different from that of other cases in this jurisdiction where a defendant reaches a plea agreement pursuant to which he pleads guilty to an information and upon conclusion of said proceeding by way of a change of plea motion and sentence on the information the Court is then requested to order dismissal of the indictment in the original case.

        Plaintiff has attempted to impress upon the Court that the exclusion of the 2 recordings as trial evidence in Criminal No.  No. 04-250(JAG) is what led to the dismissal of the indictment in said case.  He classifies this dismissal as a favorable outcome.  There is absolutely no evidence to reach that conclusion. As previously outlined in this opinion, the prosecution had evidence that went beyond the N-17 and/or N-18 recordings to present before a petite jury to prove the charges.  The underlying premise advanced has been that because these 2 recordings were suppressed, confidential informant Duffis-Young would be precluded from testifying about what he stated he had directly spoken to

CIVIL 12-1605CCC                    31

Armstrong regarding the payment of money for the heroin transaction to be imported from Aruba to Puerto Rico with the down payment being made through Grand Central Cambio and Armstrong in Jamaica.  There is no indicia that, had the Court rejected Armstrong's plea of guilty on the information for tampering the jury, the indictment in Crim. No. 04-250(JAG) would have been dropped.  These are two criminal cases that are coexisting at a given moment in time.  Before Armstrong was tried by a jury on the indictment in Crim. No. 04-250(JAG) he started negotiating a plea to an information of a totally different offense.  Granted that he pled to a misdemeanor which is a lesser crime than the offenses for which he was indicted.   What is, however, ultimately important as far as the favorable outcome element of his malicious prosecution claim is that only because and after he self-convicted on the misdemeanor charge of jury tampering and had been sentenced for it were the charges in Crim. No. No. 04-250(JAG) dismissed.  The Court's determination as to the favorable outcome element of a malicious prosecution claim cannot ignore the reality of his plea of guilty in Crim. No. 09-309(JAG).   When Armstrong's indictment was dismissed his status was that of a convicted offender by way of a coetaneous information for a serious violation of law given the threat  posed to the integrity of the jury system in federal courts.

        Based on the preceding findings of fact, the Court reaches the following:

### CONCLUSIONS OF LAW

        (1)    The FTCA requires application of the "law of the place" where the alleged wrongful actions occurred, so Puerto Rico law provides the relevant standards for Armstrong's malicious prosecution claim.  28 U.S.C. § 1346(b);

CIVIL 12-1605CCC                    32

González-Rucci   v.   U.S.   Immigration   and   Naturalization   Service,
495 F.3d 45, 49 (1st Cir. 2005).


(2)   To succeed on a claim for malicious prosecution under Puerto Rico
law, a plaintiff must prove four elements: (1) that a criminal action was initiated
or instigated by the defendants; (2) that the criminal action terminated in favor
of plaintiff; (3) that defendants acted with malice and without probable cause;
and (4) that plaintiff suffered damages.   Failure to prove any element is
dispositive.  Barros-Villahermosa v. United States, 642 F.3d 56 (1st Cir. 2011).


(3)   Armstrong did not submit any evidence during the bench trial
showing that  any of the United States' agents, particularly S.A. Carpio or
A.U.S.A. Henwood, acted with malice during either the criminal investigation
or the grand jury proceedings.  In reaching this legal conclusion, we reaffirm
the factual findings stated above which establish that:

  (a)   the evidence does not support the allegation that the N-17 tape was
        fabricated:

  (b)   the criminal investigation that preceded Armstrong's indictment was
        a legitimate law enforcement endeavor that was based on sources
        and information which reached way beyond this single recording:

  (c)   the same conclusion applies to the testimonies presented to the
        indicting grand jury:

  (d)   the N-17 recording was not played to the grand jury nor a
        transcription of the same provided to the grand jurors:

  (e)   the confidential informant's testimony to the grand jury was based
        on his own recollection of conversations which he had not only with

CIVIL 12-1605CCC                    33

Armstrong but with others charged as his  co-conspirators in Criminal No. 04-250(JAG) on importation of heroin to Puerto Rico and related to actions taken with regard to drug money payments, and:

(f)     there is no evidence whatsoever that AUSA Henwood or S.A. Carpio, referred to by Armstrong as "agents of the United States" in this case, had knowledge of or instigated, furthered or facilitated the tampering of N-17 or of any other evidence or that they presented any false evidence to the grand jury. What the evidence has established is that neither the investigating agent who testified before the grand jury nor the prosecutor who presented evidence before it engaged in improper investigative or prosecutorial practices that jeopardized the integrity of the grand jury's investigation.

Therefore, the Court finds that malice, the linchpin of Armstrong's malicious prosecution claim, is nowhere to be found.

(4)   The circumstances outlined in the factual findings numbered 21 to 26 shatter another essential element of Mr. Armstrong's malicious prosecution claim, to wit: that the outcome of the criminal case must have been favorable to him.  Thus, the favorable outcome element of the criminal case is also missing in this malicious prosecution action.

CIVIL 12-1605CCC                    34

     For the reasons stated, the remaining malicious prosecution claim of plaintiff's complaint is DISMISSED. Judgment in conformity with the findings set forth in this Opinion and Order will follow.

     SO ORDERED.

     At San Juan, Puerto Rico, on June 20, 2016.


                    S/CARMEN CONSUELO CEREZO
                    United States District Judge